K4FVDAVC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                            17 CR 610 (LGS)

GARY DAVIS,

               Defendant.        REMOTE TELECONFERENCE
                                   (Bail Application)
------------------------------x

                                   New York, N.Y.
                                   April 15, 2020
                                   3:05 p.m.

Before:

                 HON. LORNA G. SCHOFIELD,

                                 District Judge

                      APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
JORDAN L. ESTES
    Assistant United States Attorney

NATALI J. H. TODD
    Attorney for Defendant


ALSO PRESENT:  RENA BOLIN, Pretrial Services

K4FVDAVC

1       (Remote teleconference)

2       THE COURT:  Good afternoon, everyone.

3       MS. ESTES:  Good afternoon, your Honor.

4       THE COURT:  Mr. Street, do you want to call the case.

5       THE DEPUTY CLERK:  Yes, your Honor.

6       We're here in the matter of 17 CR 610, defendant

7   number one, *United States v. Gary Davis*.

8       We're here before The Honorable Lorna G. Schofield.

9       Before we begin, I'd like to remind the parties of

10  several rules or restrictions that are in effect due to the

11  novel coronavirus.

12      First, while members of the public and press have

13  presumptive -- well, there are no members of the public and

14  press on the phone right now, but recording or broadcasting of

15  this proceeding is prohibited by the policy of the Judicial

16  Conference of the United States.  Violation of these

17  prohibitions may result in sanctions.

18      The CARES Act authorizes district courts to conduct

19  specific specified criminal proceedings if the requirements of

20  the act are met by videoconference or by telephone conference,

21  if videoconferencing is not reasonably available and the

22  defendant consents.  This hearing is one of these proceedings.

23      All right.  We're here before The Honorable Lorna G.

24  Schofield.

25      Just please state your name before you speak, every

1    time you speak, as we have a court reporter present.

2            THE COURT:  Okay.  Thanks, everyone.

3            Who's going to be speaking for the government?

4            MS. ESTES:  It's Jordan Estes, your Honor.

5    Good afternoon.

6            THE COURT:  Good afternoon.

7            And who's speaking for Mr. Davis?

8            MS. TODD:  Natali Todd.

9    Good afternoon, your Honor.

10           THE COURT:  Good afternoon.

11           And I understand we have Rena Bolin from pretrial

12   services on as well.  Are you present?

13           MS. BOLIN:  Yes.  Good afternoon, your Honor.

14           THE COURT:  Good afternoon.

15           And thank you to the court reporter who's attending

16   this hearing.

17           So we are here for a bail application by the

18   defendant, Gary Davis.  And I just first want to confirm what

19   defense counsel had said in her moving papers:

20           First, that Mr. Davis waives his appearance at this

21   hearing.  And second, that he consents to this hearing being

22   conducted telephonically with his counsel.

23           Is that correct, Ms. Todd?

24           MS. TODD:  Yes, your Honor.

25           THE COURT:  Okay.  So I have reviewed the defendant's

1    motion papers, which I received on Saturday, April 11th.  I

2    have also reviewed the government's opposition, which I

3    received on April 13th, Monday.  And I've also reviewed the

4    original pretrial services bail report which is dated October

5    17th.

6                And so I don't need you to repeat what's in your

7    papers, because I have just reviewed them.  But what I would

8    like to ask, first let me ask Ms. Todd, what is Mr. Davis's

9    current medical condition?

10               MS. TODD:  Your Honor, I spoke with him the last time

11   was Sunday night.  And his condition remains the same as

12   described in my submission.  I've been in communication with

13   his mother, who speaks with him on a daily basis.  And I spoke

14   with her last night.  And she informed me that his condition

15   was pretty much the same.  Nothing's changed.

16               THE COURT:  Okay.

17               MS. ESTES:  Your Honor --

18               THE COURT:  Let me just finish with Ms. Todd.

19               Are there any other updates to your submission?

20               MS. TODD:  There are no other updates, your Honor.

21               THE COURT:  Okay.  I'll hear from Ms. Estes.

22               Do you have any updates?

23               MS. ESTES:  Yes, your Honor.

24               We actually reached out to GEO and got an update from

25   them this morning that Mr. Davis's vitals were taken today and

1    they were normal.  So he did not have a fever as of today.

2            My understanding is that his last fever was recorded

3    on April 8th.

4            THE COURT:  Okay.  And I had the impression from your

5    submission that oxygen levels or oxygen saturation was being

6    measured.  Do you have any information about his oxygen?

7            MS. ESTES:  My understanding is that it is normal.

8    His vitals were normal today.  And my understanding is that GEO

9    is -- for anybody that's COVID-positive, they are testing the

10   oxygen two to three times daily.  And I think that is the

11   primary driver of what might get somebody sent to the hospital.

12           THE COURT:  All right.  Yes.

13           MS. TODD:  Go ahead, your Honor.

14           THE COURT:  Okay.  So one question I had for the

15   government is, in your submission, your argument was based on

16   18 U.S.C. 3145(c), but you didn't mention 18 U.S.C. 3142(i).

17   And I was wondering whether it's your view that it's not

18   applicable or there's some other reason that you didn't mention

19   it.

20           MS. ESTES:  Your Honor, our view is that this case is

21   governed by 18 U.S.C. 1343, since we are in the post-plea

22   stage; and that under that provision, detention is mandatory at

23   this point unless there are exceptional reasons as set forth in

24   1345.

25           THE COURT:  Okay.

1       And Ms. Todd, anything more you can say about the

2   applicable standards?

3       MS. TODD:  I believe they both govern, your Honor.

4   And I think the exceptional circumstance under 3145(c) would

5   be, in my interpretation, the exceptional reasons that the

6   Court would need to consider, in conjunction with the other

7   section that the Court mentioned.

8       But I also recognize that the government did not --

9   the government's opposition focused on the danger to the

10  community, which I am prepared to address.

11      THE COURT:  All right.  I'll hear you on that in just

12  a second.  Just give me a moment.

13      MS. TODD:  Yes, your Honor.

14      MS. ESTES:  Your Honor, Jordan Estes.

15      One more thing.

16      So the reason we did not address 3142 is because

17  that's the section that says release or detention of a

18  defendant pending trial.  And so my understanding is it does

19  not apply after the plea.  18 U.S.C. 3143 is entitled "Release

20  or Detention of a Defendant Pending Sentence or Appeal."  So I

21  think that is the one, that one plus 3145 are the applicable

22  standards.

23      THE COURT:  Got it.

24      So let me just look at 18 U.S.C. 3143.

25      Okay.  So, Ms. Todd, I'll just tell you that I found

1    the government's arguments persuasive, and I am primarily

2    concerned about the danger to the community.  So if you'd like

3    to be heard on that, I'll hear you.

4         MS. TODD:  Thank you, your Honor.

5         With respect to the -- I realize that the government

6    indicated that his oxygen levels were tested.  I maintain,

7    based on my submission to the Court and my ongoing

8    communication with Mr. Davis, that that has never occurred; and

9    that the only thing that the doctor did was check his blood

10   pressure levels; that there was no machine placed on his

11   fingers to check his oxygen level.  So we challenge that.

12        With respect to the danger to the community, Judge, I

13   sort of want to go back to the fact that he has not been in the

14   community since April of 2011.  And the community with which he

15   committed these crimes were in the Bronx, where he was part of

16   a gang and engaged in the activities for which he was initially

17   charged in the state, and then subsequently in the federal

18   system.

19        And as the Court is aware, based on my papers -- and I

20   don't believe the government challenges this -- Mr. Davis

21   surrendered in April 2011, and was incarcerated at Rikers for

22   five years, and was released in 2016, February, when there was

23   an acquittal on that case.

24        At that time he did not go back to the Bronx, because

25   during the time that he had been incarcerated at Rikers, the

1　family had moved out of the Bronx to Delaware.  And so they

2　drove directly from Delaware -- from the Bronx Supreme Court to

3　Delaware, where he remained, got a job, and was essentially

4　starting a new life before -- and then the federal indictment

5　came about, and he surrendered in -- on October 17th, I

6　believe, 2017, drove from Delaware, his sister drove him to the

7　courthouse, and he surrendered.

8　　　　He certainly, having testified publicly at trial,

9　Judge, certainly has no intention or cannot go back to the

10　Bronx because he is considered a rat and not welcome and

11　certainly wouldn't want to go back there.

12　　　　He has every intention to continue to cooperate with

13　the government.  And I think the stakes are very high for him.

14　And having been out of the community where he started, I think,

15　bodes well for him, Judge, with respect to danger to the

16　community.

17　　　　He's pleaded guilty to some serious crimes, there's no

18　doubt about that.  But if we look at all that he has done, I

19　don't see clear and convincing evidence that he is a continuing

20　danger to the community, having left the community and with a

21　life sentence hanging over his head, should he violate the

22　proffer agreement that she signed up.

23　　　　THE COURT:  Okay.  Thank you.

24　　　　Ms. Estes, would you like to be heard?

25　　　　MS. ESTES:  Your Honor, I would just remind the Court

1   that Mr. Davis, when he pled guilty pursuant to the cooperation

2   agreement, also admitted his involvement in a prison assault

3   that took place in July 2019.  So although he has not been in

4   the community recently, he has been involved in violence in the

5   past year, and we think that's significant.

6               THE COURT:  Okay.

7               MS. ESTES:  And other than that, we'll just rely on

8   the submission.  And I would note that, as we pointed out in

9   the submission, I believe it's the defendant's burden to

10  establish by clear and convincing evidence that he's not a

11  danger, and we just don't think that can be met here.

12              MS. TODD:  Judge, before you rule, I just want to add

13  one more thing with respect to the seriousness of the virus

14  that is occurring, if the Court will allow me briefly.

15              THE COURT:  Sure.

16              MS. TODD:  Just based on the history of the time

17  limits of medical treatment at the jail, I don't think there's

18  any question that somehow everything moves very, very slowly,

19  and oftentimes at the point where it is at a critical stage.

20              And I say that's not just from what occurred in

21  December with respect to Mr. Davis needing medical treatment,

22  but just in looking at the BOP's daily update of the deaths

23  that are now occurring in the facilities, just about all of the

24  press releases indicate that by the time that the individuals

25  are taken to the hospital, they are in medical distress, they

K4FVDAVC

1    are immediately placed in a ventilator, and die within days.

2         And as of last night, there are now 16 deaths in BOP.

3    And we expect those numbers to rise, given the close proximity

4    of people who are sharing spaces who are either not showing

5    signs of infection, who are infected, as Mr. Davis is, where he

6    is right now, with the number of inmates who are sharing a dorm

7    facility.

8         Thank you, your Honor.

9         THE COURT:  Okay.  Thank you.

10        Okay.  I'm going to deny the application largely

11   because I find that the defendant hasn't shown by clear and

12   convincing evidence that he is not a danger to the community,

13   which is a required finding under either 18 U.S.C. 3145(c) or

14   3143.

15        I occupy a somewhat unique position in this case,

16   inasmuch as I have met Mr. Davis, I heard him testify at

17   length, I heard him describe his involvement in a lifetime of

18   violent crime, as well as the murder of Bolivia Beck, which is

19   what the trial was about.  And having heard all of that,

20   particularly when I also hear now that his temperature is

21   normal and that his vitals are normal, I find that I can't

22   justify releasing him on bail under the circumstances that have

23   been proposed.

24        What I would like -- I'll just say it would not make

25   any difference in my ruling, although it might prompt a

1  different kind of order, I'd like the government to obtain

2  either his medical records or an affidavit or something of an

3  evidentiary nature that they can show me that reflects that his

4  oxygen levels are normal and, if possible, that show how long

5  they have been normal.  If they are not, I don't believe that I

6  would release him, because I still believe that given the

7  danger posed, his release wouldn't be warranted.  But I might

8  be inclined to order something else to assure that his medical

9  condition is being addressed.

10            So that is my ruling.  I will issue a brief written

11  order to reflect it; and, of course, we have a transcript that

12  also reflects it.

13            Anything else we need to address?

14            MS. TODD:  Is that order going to be sealed, your

15  Honor?

16            THE COURT:  Actually, I don't know whether -- I know

17  your motion papers are sealed, because it includes all sorts of

18  medical information.  But I'm not sure that I need to seal the

19  order, because all it would say is that for the reasons

20  discussed at the conference, the application is denied, and

21  then ask for information about his medical treatment as

22  discussed at the conference.

23            So I don't think it needs to be sealed.

24            Is that okay with you, Ms. Todd?

25            MS. TODD:  Yes, your Honor.

K4FVDAVC

1        THE COURT:  Ms. Estes?

2        MS. ESTES:  That's fine, your Honor.

3        THE COURT:  Okay.  All right.

4        Thank you very much.  We're adjourned.

5                        *    *    *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25